IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SURPLUS.COM, INC., an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 10 CV 03510 |
| ORACLE CORPORATION, a California corporation, and ORACLE AMERICA, INC., a Delaware corporation (erroneously sued as Oracle USA, Inc.), | ) ) ) ) ) | Hon. Amy J. St. Eve |
| Defendants. | ) ) | |

# MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff, Surplus.Com, Inc. has filed an action against Defendants, Oracle Corporation and Oracle America, Inc. (collectively "Oracle") for breach of contract. (R. 17.) Oracle has filed a motion to dismiss the lawsuit, arguing that the allegations in the Amended Complaint reveal that the Statute of Limitations bars Plaintiff's breach-of-contract claim. (R. 25; R. 37.) Plaintiff concedes that "[t]he outcome of Defendants' motion turns on whether the Court rules as a matter of law that the UCC applies to this transaction. If it does, the four (4) year statute of limitations set forth in section 2-725(1) of the UCC applies, and Plaintiff's claim is time barred." (R. 33 at 5.) Because the allegations in the Amended Complaint require application of Illinois's Uniform Commercial Code, Plaintiff's suit for breach of contract is time-barred. The Court therefore grants Oracle's motion to dismiss, with prejudice, and denies Oracle's motion to strike as moot.

**BACKGROUND**

On May 3, 2010, Plaintiff filed a complaint against Oracle in the Circuit Court of Cook County, seeking damages for breach of contract. (R. 1 at 1; R. 1-2.) On June 8, 2010, Oracle removed the case to federal court, invoking this Court's diversity jurisdiction. (R. 1 at 2.) Oracle subsequently filed a motion to dismiss, contending that Plaintiff's breach-of-contract claim could not survive the Uniform Commercial Code's four-year Statute of Limitations provision. (R. 8.) Plaintiff elected not to respond to the motion to dismiss, but instead filed an Amended Complaint on August 5, 2010. (R. 17.) Oracle now seeks to dismiss the Amended Complaint. (R. 22.)

Plaintiff alleges that it purchased a software program called "Dynamic Pricing Engine and *e*Auction MME, Version 1.3 software" from Siebel Systems, Inc., which in turn ultimately became Oracle America. (R. 17 at 2.) It also alleges that it obtained "a product entitled Siebel Systems, Inc. Maintenance and Support," along with the software program. (*Id.*) That program allegedly came with a Software License and Services Agreement ("SLSA") and an End User License and Services Agreement ("EULA"), the former of which provided program and services warranties. (*Id.* at 3.) The Amended Complaint further provides that Siebel's e-Business senior account executive, Aaron Schmidt, "informed Surplus.com that the Software was not fully operational 'out of the box,' and that Surplus.com would have to hire a separate company to develop and implement the Software." (*Id.* at 5.)

Plaintiff allegedly could not obtain the license files for the software without first developing and implementing it, as Plaintiff would not have a development IP address until that time. (*Id.* at 6.) According to the Amended Complaint, Mr. Schmidt directed Plaintiff to retain a

company called Dynamic Quest ("DQ") to develop and implement the software. (*Id.*) Plaintiff hired DQ, which developed and implemented the software "over a period of approximately six weeks." (*Id.*) Plaintiff further alleges that, "[d]ue to the extensive development and implementation required to get the Software to become operational . . . Siebel did not sell a software product to Surplus.com. Rather, Siebel sold Surplus.com intangible intellectual property rights that DQ used to create from scratch Surplus.com's custom-made auction website to meet Surplus.Com's specific individualized requirements." (*Id.* at 7.)

In addition, Plaintiff alleges that DQ "never properly implemented or developed the Software," that "Mr. Schmidt did not assist Surplus.com in resolving the issue, and did not provide any support," and that, despite purchasing an additional six-month maintenance agreement that entitled it to Version 7.0 of the software, Siebel did not provide Surplus.com with that version. (*Id.* at 7-8.) Through these and other alleged acts, Plaintiff contends that Oracle breached their contract. (*Id.* at 10-12.)

On August 27, 2010, Oracle filed a motion to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). (R. 22.) Oracle contends that the Amended Complaint alleges breach of contract for events that occurred between November 2000 and May 6, 2004, and therefore the applicable statute of limitations bars the case. (R. 25 at 2.)

## LEGAL STANDARD

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Pursuant to Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief."

Fed. R. Civ. P. 8(a)(2).  This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic v. Twombly,* 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41 (1957)).  As the Seventh Circuit teaches, this "[r]ule reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross,* 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002)).

Under federal notice-pleading standards, a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555.  Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly,* 550 U.S. at 570).  "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also McGowan v. Hulick,* 612 F.3d 636, 637 (7th Cir. 2010).

## ANALYSIS

### I. The Illinois Statute of Limitations Applies to the Present Case

The parties dispute whether the Court should apply Illinois's or California's statute of limitations in this case.  (R. 33 at 5; R. 37 at 1-2.)  Plaintiff submits that the latter state's statute of limitations applies, while Oracle contends that the former state's statute governs.  (*Id.*)  The parties agree that the substantive law of California governs the contracts at issue in the present case.  (R. 25 at 4 n.3; R. 33 at 5.)  Nevertheless, Oracle is correct to point out that federal courts sitting in diversity apply the statute of limitations of the forum state.  (R. 37 at 1.)  *See, e.g.,*

4

*Klaxon Co. v. Stentor Elec. Co., Inc.*, 313 U.S. 487, 496 (1941) (holding that federal courts sitting in diversity employ the choice-of-law rules of the forum state); *Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 707 (7th Cir. 2004) ("A federal court sitting in diversity must follow the statute of limitations that the state in which it is sitting would use. Illinois considers statutes of limitations to be procedural questions governed by the law of the forum.") (internal citations omitted). Accordingly, Illinois's statute of limitations applies to this case.

## II. The Illinois Uniform Commercial Code Provides the Relevant Statute of Limitations

Illinois's Uniform Commercial Code ("UCC") provides the relevant statute of limitations for causes of action founded on breach of contract with respect to the sale of goods. 810 ILL. COMP. STAT. 5/2-724. The parties disagree, however, whether the UCC applies. (R. 25 at 3-5; 33 at 6-10.) The Court agrees with Oracle that it applies.

Article 2 of the UCC applies to "transactions in goods." 810 ILL. COMP. STAT. 5/2-102. The dispositive question is whether Oracle's "Dynamic Pricing Engine and *e*Auction MME, Version 1.3 software" was a "good" for purposes of the UCC. Oracle correctly points out that computer software typically constitutes a "good" under the UCC. (R. 25 at 4.) *See Dealer Mgmt. Sys, Inc. v. Design Auto. Group, Inc.*, 822 N.E.2d 556 (Ill. App. Ct. 2005) ("A sampling of decisions from various jurisdictions shows that courts have generally recognized that computer software qualifies as a 'good' for purposes of the UCC."); *Newcourt Fin. USA, Inc. v. FT Mortg. Cos., Inc.*, 161 F. Supp. 2d 894, 897 (N.D. Ill. 2001) (finding custom software to be a good); *see also Digital Ally, Inc. v. Z3 Tech., L.L.C.*, No. 09-CV-2292, 2010 WL 3974674 (D. Kan. Sept. 30, 2010) (collecting cases and concluding that "[m]ost courts to have considered the issue have held that computer software qualifies as a 'good' under Article 2 of the UCC.").

Plaintiff concedes that "it is undisputed that 'off-the-rack' software is a good under the UCC," but nevertheless argues that "a transaction predominantly involving the intellectual property rights to software is outside the scope of the UCC." (R. 33 at 6.) To support this characterization of the relevant software, Plaintiff points to paragraphs 25 to 28 of the Amended Complaint, which allege, in relevant part, that "the Software was actually intellectual property rights to a platform on which businesses could create their own highly-customized [sic] auction websites to meet their specific individualized requirements." (*Id.* (citing R. 13-1 at 6-7).) Plaintiff presumably portrays the software in this manner due to the holding in *Architectronics*—a case relied upon by Plaintiff (R. 33 at 6)—that an "agreement [was] not subject to Article Two of the UCC" because "the predominant feature of the [contract] was a transfer of intellectual property rights." *Architectronics, Inc. v. Control Sys., Inc.*, 935 F. Supp. 425, 432 (S.D.N.Y. 1996).

Plaintiff alleges that it had to develop and implement the software, which did not work "out of the box." (R. 13-1 at 6.) Indeed, Plaintiff alleges that, at Mr. Schmidt's direction, it had to retain DQ to develop and implement the software. (*Id.*) Under Illinois law, the UCC does not apply to the software-acquisition agreement if that agreement's purpose is "the rendition of service, with goods incidentally involved." *NIM Plastics Corp. v. Standex Int'l Corp.*, 11 F. Supp. 2d 1003, 1005 (N.D. Ill. 1998). If its purpose is "a transaction of sale, with labor incidentally involved," however, the UCC applies.. *Id.*

In order to determine whether the Amended Complaint reveals that the software was subject to the Illinois UCC, the Court must determine the "predominant purpose" of the agreement, while viewing all well-pleaded allegations in the light most favorable to Plaintiff. As

another court in this district has explained, "[w]here a sale . . . of goods also requires the sale . . . of services, Illinois classifies the agreement as 'mixed' and requires the court to apply a 'predominant purpose' test to determine whether the UCC governs the agreement." *Newcourt Fin. USA, Inc. v. FT Mortg. Cos., Inc.*, 161 F. Supp. 2d 894, 897 (N.D. Ill. 2001). "If the agreement's 'primary purpose' is the sale . . . of goods, then the UCC is applicable to the entire agreement." *Id.* at 879-80 (internal citations omitted).

The following factual allegations inform the Court's determination whether the Amended Complaint reveals that the relevant agreements constitute the sale of "goods" under the UCC. First, Plaintiff "purchased a software program," which came with the SLSA and EULA agreements. (R. 17 at 2-3.) Under the SLSA, Siebel warranted that each program would "perform in all material respects the functions described in the Documentation when operated in accordance with the Documentation on a Support Platform." (*Id.* at 3.) Siebel also agreed:

> [t]o use its commercially reasonable efforts to correct or provide a workaround for reproducible Program errors that cause a breach of this warranty, or if Siebel is unable to make the Program operate as warranted within a reasonable time considering the severity of the error and its impact on the Customer, Customer shall be entitled to return the Program to Siebel and recover the fees paid to Siebel for the Program license and any Services that directly relate to the Program license.

(*Id.* at 3.) Under the EULA's "Limited Services Warranty," Siebel promised that it would perform its services "(i) in a professional and workmanlike manner and (ii) substantially in accordance with the relevant Statement of Work . . . ." (*Id.* at 4.) Pursuant to the Limited Services Warranty, "Siebel agreed to perform the Services, but [agreed that,] if Siebel is unable to perform the Services as warranted, Siebel agreed to refund the fees paid to Siebel for the nonconforming Services." (*Id.*) Siebel's "Maintenance Services Policy" also required it "to use

7

commercial efforts to cure . . . reported and verifiable errors in Supported Programs so that such Programs perform in all material respects the functions described in the associated Documentation," and "to supply Surplus.com with updated versions of the Software." (*Id.* at 5.)

The Amended Complaint summarized the relevant contracts in the following terms: "Collectively, these Agreements . . . required Siebel to provide Surplus.com with functional software and maintenance services during implementation and production use of the Software, as well as to timely provide Surplus.com with updates to the Software." (*Id.*)

The preceding factual allegations, construed in the light most favorable to Plaintiff, reveal that the predominant purpose of the relevant agreements was "a transaction of sale, with labor incidentally involved." *NIM Plastics*, 11 F. Supp. 2d at 1005. As alleged by the Amended Complaint, the agreements were geared toward the acquisition of software, which—as noted—constitutes a "good" under the UCC. Plaintiff's allegations reveal that the various services envisioned by those agreements were incidental in nature and certainly ancillary to the software itself. *See generally Allstate Life Ins. Co. v. PeopleSoft, Inc.*, No. 03-CV-7025, 2004 WL 1375383, at *3 (N.D. Ill. May 26, 2004) ("A careful review of the contract indicates that it is a [*sic*] predominantly a contract for the sale of computer software with incidental services, such as installation, technical support, maintenance, training, and license to permit use of the software asserts. Allstate's attempt to construe the contract as one for services is inconsistent with the terms of the contract."). Plaintiff cannot avoid the import of these factual allegations by seeking to characterize the agreements or the relevant software as "intellectual property rights to a platform." (R. 17 at 6.) Not only is such a characterization inconsistent with the import of the Amended Complaint's unambiguous allegations, but it constitutes little "more than mere labels

8

and conclusions," which are insufficient to defeat a motion to dismiss for failure to state a claim. *See Bissessur v. Indiana Univ. Bd. of Trustees*, 581 F.3d 599, 602 (7th Cir. 2009).

Plaintiff presents a number of arguments why the pertinent agreements were predominantly for services, rather than goods. (R. 33 at 6-8.) These arguments fail under Plaintiff's allegations in the Amended Complaint.

First, Plaintiff submits that "[t]he development and customization of the Software was a major part of the transaction between Siebel and Plaintiff. The reason Plaintiff purchased the specific Software was because of the Software's ability to be significantly customized and developed to meet Plaintiff's individual needs." (R. 33 at 7.) This simply amounts to argument, however, which cannot substitute for the allegations of the Amended Complaint. *See Gandhi v. Sitara Capital Mgmt., L.L.C.*, 689 F. Supp. 2d 1004, 1016 (N.D. Ill. 2010) ("Argument in briefs, though, is no substitute for allegations in pleadings.").

Second, Plaintiff cites the Illinois Service Occupation Tax Act, the Illinois Retailers' Occupation Tax Act, and Illinois Department of Revenue Regulations to establish that the software at issue in the present case "is not a good as defined under the UCC." (R. 33 at 7-8.) The Illinois legislature's view on custom software, as revealed through the cited acts and regulations, is irrelevant to the question whether the relevant agreements between the parties are subject to the UCC. Indeed, none of the Acts or Regulations cited by Plaintiff purports to offer a view on the meaning of "goods" for the purposes of the UCC.

Finally, Plaintiff points out that the Amended Complaint "alleges that the Software needed to be developed from scratch, as the Software was a mere template for Plaintiff to design, build, develop and implement to its detailed specifications for use on its website." (R. 33 at 6

9

(citing R. 17 at 6, ¶¶ 26-27.)  The allegations contained in the two cited paragraphs, when read in light of the other allegations in the Amended Complaint, do not reveal that the software Defendants sold to Plaintiff constituted a subset of a larger service.  Paragraph 27 alleges that DQ—the third party Plaintiff hired to develop the software—"engage[d] in significant customized programming of the website in order to make Surplus.com's website look and function in the unique manner in which Surplus.com requested."  (R. 17 at 6.)  Even viewing the allegations in the light most favorable to Plaintiff, this and other allegations in the Amended Complaint merely reveal that one had to develop the relevant software to render it fully operational for Plaintiff's purposes.  Although that development entailed services—though ones in fact performed by an entity other than Oracle—those services were ancillary to the software that was at the heart of the relevant agreements.  The agreements' provision for maintenance and technical support do not render the software a "service" rather than a "good."  *Accord Allstate*, 2004 WL 1375383, at *3.

**III.    Because the Amended Complaint Alleges a Breach of Contract for Sales More than Four Years After the Cause of Action Accrued, the Court Grants Oracle's Motion to Dismiss**

Because the Illinois Uniform Commercial Code applies, so too does the UCC's four-year Statute of Limitations for actions alleging breach of contract.  810 ILL. COMP. STAT. 5/2-724.  According to the Amended Complaint, Oracle's last act giving rise to breach of contract was its May 6, 2004, refusal to address Plaintiff's concerns.  (R. 17 at 9-10.)  Because Plaintiff did not file suit for breach of contract until May 3, 2010, the Statute of Limitations bars Plaintiff's action.  *See* R. 33 at 5 (conceding that, if the UCC applies to the transaction," the four (4) year

statute of limitations set forth in section 2-725(1) of the UCC applies, and Plaintiff's claim is time barred."

Plaintiff was aware of the Statute of Limitations issue before it filed its Amended Complaint, having been apprised of the same by Oracle's unanswered motion to dismiss Plaintiff's original complaint. Nevertheless, the Amended Complaint does not allege that Oracle performed actions amounting to breach of contract within the four-year period preceding Plaintiff's filing this suit. As noted above, Plaintiff even concedes this outcome. Because it would be futile to file a second amended complaint, the Court dismisses the lawsuit with prejudice. *See, e.g.*, *DeJesus v. Jeschke*, No. 02-CV-1685, 2002 WL 1400532, at *2 (N.D. Ill. June 27, 2002) ("[I]f the statute of limitations for the underlying action has expired, the court may . . . in its discretion dismiss with prejudice.").

## CONCLUSION

For the reasons explained above, the Court grants, with prejudice, Defendants' motion to dismiss. Oracle's motion to strike is denied as moot.

Dated: December 23, 2010

**ENTERED**

_____
**AMY J. ST. EVE**
**United States District Court Judge**